CALTEX OIL VENTURE, CALTEX MANAGEMENT CORPORATION, TAX MATTERS PARTNER, PETITIONER *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3793–08.        Filed January 12, 2012.

C, an accrual-basis partnership, entered into a turnkey contract under which it paid $5,172,666 by cash and note in December 1999 for the drilling of two oil and gas wells. Although some site preparation required under the contract occurred in 1999, no drill penetrated the ground for purposes of drilling a well by or on behalf of C within 90 days after the end of 1999. C claimed a full deduction for the $5,172,666 as intangible drilling costs (IDCs) on its 1999 Federal tax return. R issued a notice of final partnership administrative adjustment to P, C's tax matters partner, determining, inter alia, that C was not entitled to deduct the IDCs because the economic performance requirement of I.R.C. sec. 461(h) was not satisfied. *Held*: For purposes of I.R.C. sec. 461(i)(2)(A), "drilling of the well commences" when there is actual penetration of the ground surface in the act of drilling for purposes of spudding a well. Mere site preparation is insufficient. Under this special timing rule, C did not satisfy the economic performance requirement of I.R.C. sec. 461(h). *Held*, *further*, the 3½-month rule of sec. 1.461–4(d)(6)(ii), Income Tax Regs., does not enable C to treat any of the services due under the contract as having been economically performed in 1999, because, in the case of an undifferentiated, non-severable con-

18

> tract, the 3½-month rule contemplates that *all* of the services called for must be provided within 3½ months of payment. *Held*, *further*, in the alternative, if C is able to invoke the 3½-month rule and treat some of the services due under the contract as having been economically performed in 1999, then deductions under the 3½-month rule are limited to payments of cash or cash equivalents and do not include payments made by notes.

*Bernard Stephen Mark* and *Richard Stephen Kestenbaum*, for petitioner.

*Halvor N. Adams III*, *Margaret Burow*, and *James P.A. Caligure*, for respondent.

## OPINION

GUSTAFSON, *Judge*: On November 13, 2007, the Internal Revenue Service (IRS) issued a notice of final partnership administrative adjustment (FPAA) for taxable year ending December 31, 1999, to Caltex Management Corp., the tax matters partner (TMP) of Caltex Oil Venture. (It is the latter entity—Caltex Oil Venture—to which we refer herein as "Caltex".) This case is a partnership-level action based on a petition filed by the TMP pursuant to section 6226.[1] The matter is currently before the Court on the IRS's motion for partial summary judgment filed pursuant to Rule 121, which asks us to hold that Caltex is not entitled to deduct the $5,172,666 that it reported in 1999 as nonproductive intangible drilling costs (IDCs).[2] As explained below, we will grant partial summary judgment in the IRS's favor as to most of the issues addressed in its motion, but we find that other issues—e.g., under the general rule of section 461(h), the amount, if any, of IDCs that was incurred in 1999—may remain for trial.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986 as in effect for the year in issue (codified in 26 U.S.C., and referred to herein as "the Code"), and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] IDCs are drilling cost outlays associated with oil and gas drilling operations. IDCs range from amounts paid for the clearing of ground, draining, road-making, and surveying work to all amounts paid for labor, fuel, repairs, hauling, and supplies (e.g., drilling muds, chemicals, and cement) incident to and necessary in the drilling and preparation of wells for the production of oil and gas. *See* 26 C.F.R. sec. 1.612–4, Income Tax Regs.

*Background*

The following facts are not in dispute and are derived from the pleadings, the stipulations of fact, the parties' motion papers, and the supporting exhibits attached thereto.

Caltex was organized in 1999. For Federal income tax purposes, Caltex is a partnership that uses the accrual method of accounting and has a taxable year ending December 31. On December 31, 1999, Caltex entered into a turnkey contract with Red River Exploration, Inc. Under the contract, Red River assigned to Caltex a 74.33-percent interest in a well in Louisiana designated "J.O. Kimbrell 2–8#1" and a 90-percent interest in a well in Oklahoma designated "NW Sulphur #2". Red River agreed to "commence or cause to be commenced" the drilling of wells at the two sites "[a]s soon as practicable after the execution of * * * [the contract] but in no event later than March 31, 2000". "[T]hereafter * * * [Red River would] continue or cause to be continued the drilling [of the wells] with due diligence and in a workmanlike manner to a depth to adequately test the objective formation." For purposes of the IRS's motion for partial summary judgment, we assume (as Caltex asserts) that "a typical well will take two years to grow from concept to commencement to production for the purpose of selling hydrocarbons." [3]

The contract called for Caltex to pay to Red River by the close of business on December 31, 1999, $4,123,333 in cash and note "as Turnkey Drilling Costs" and "$1,049,333 for the Intangible Completion Costs", for a total of $5,172,666. Caltex paid Red River with two checks dated December 27, 1999, in the amounts of $308,293.50 for "drilling" and $119,892 for "completion", [4] totaling $428,185.50, and executed a note in favor of Red River for approximately $4.8 million. [5]

---

[3] Steps in this process may overlap, but they include: (i) collecting data, acquiring leases, securing access roads, staking and permitting the well (one to two years); (ii) designing the procedures and getting estimates from various service companies (three to four months); (iii) negotiating contracts for subcontract services, equipment, rigs, and specialists, as appropriate (three to four months); (iv) location work, including site operations, equipment delivery, and installation (four weeks); (v) actual drilling operations (four to eight weeks); (vi) completion and testing operations (four weeks); (vii) buying and building surface facilities (four weeks); and (viii) negotiating gas sales, saltwater disposal, and field supervision.

[4] The record also reflects that on December 27, 1999, Caltex paid Red River an additional $30,481 for "Int", presumably interest.

[5] The record does not include any note executed by Caltex in favor of Red River, but for pur-

By December 31, 1999, drilling permits were secured for the two well sites identified in the contract, and we assume that in early 2000 Red River engaged in activities to prepare to drill the wells. However, the parties have stipulated that "[n]o drill penetrated the ground for purposes of drilling a well by or on behalf of Caltex Oil Venture during 1999 or 2000."

Caltex timely filed, for 1999, a Form 1065, "U.S. Partnership Return of Income". On the Form 1065, Caltex claimed a deduction of $5,172,666 for nonproductive IDCs.

In November 2007 the IRS issued its FPAA determining that Caltex was not entitled to deduct any portion of the IDCs because, among other things, the economic performance requirement of section 461(h) was not satisfied. The IRS also disallowed $744,241 in other deductions claimed by Caltex on its 1999 return and determined that Caltex was liable for accuracy-related penalties under section 6662(a) and (b)(1) and (2).

On February 12, 2008, Caltex, through its TMP, timely filed a petition pursuant to section 6226 seeking a readjustment of the IRS's determinations in the FPAA. Caltex asserted, among other things, that the IRS erred in determining (i) "that the deduction for non-productive intangible drilling costs in the amount of $5,172,666.00 is improper"; (ii) that economic performance was not met by Caltex under Section 461(h)"; and (iii) that they "are subject to penalties under Section 6662(a), 6662(b)(1) and in 6662(b)(2)." In doing so, Caltex asks us to find that there "are no adjustments to Partnership items for the year in question" and that "no penalties are properly asserted against any investor of Caltex". At the time the petition was filed, the principal place of business for both Caltex and its TMP was Pennsylvania.

On September 18, 2009, the IRS moved for partial summary judgment on the issue of whether the economic performance requirement of section 461(h) was satisfied with respect to the $5,172,666 deduction claimed by Caltex in 1999 for IDCs. In particular, the IRS asks us to narrow the issues of the case by holding that the economic performance requirement of section 461(h), if satisfied at all, limits

poses of the IRS's motion we assume (in Caltex's favor) that Caltex satisfied its payment obligations under the contract by executing a note in favor of Red River on or before December 31, 1999.

Caltex's maximum potential deduction for 1999 for IDCs to amounts paid in 1999 for work actually performed in 1999.[6] Caltex opposes the IRS's motion.

For purposes of deciding this motion, we will consider to what extent, if any, the services attributable to the $5,172,666 in IDCs were economically performed during 1999 or within a time that the Code and regulations allow the services to be treated as if performed in 1999.

## *Discussion*

### I. *Standard for summary judgment*

Under Rule 121 (the Tax Court's analog to Rule 56 of the Federal Rules of Civil Procedure) the Court may grant full or partial summary judgment where there is no genuine issue of any material fact and a decision may be rendered as a matter of law. The moving party bears the burden of showing that no genuine issue of material fact exists, and the Court will view any factual material and inferences in the light most favorable to the nonmoving party. *Dahlstrom v. Commissioner*, 85 T.C. 812, 821 (1985); *cf. Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (same standard under Fed. R. Civ. P. 56). "The opposing party is to be afforded the benefit of all reasonable doubt, and any inference to be drawn from the underlying facts contained in the record must be viewed in a light most favorable to the party opposing the motion for summary judgment." *Espinoza v. Commissioner*, 78 T.C. 412, 416 (1982).

The issue presented in the IRS's motion—i.e., whether the economic performance requirement of section 461(h) is satisfied with respect to the $5,172,666 deduction claimed by Caltex in 1999 for IDCs—can be largely resolved on the basis of the undisputed facts. As a result, we will grant the IRS's motion in part.

### II. *Statutory and regulatory framework*

The issue before us is an accounting question: What is the proper year for claiming deductions for costs that are related

---

[6] On the basis of a stipulation agreed to by Caltex, the IRS asserts that this maximum potential deduction is $7,072.80. We hold that summary judgment is not appropriate as to the precise amount (*see* section V of the argument below), but we hold in favor of the IRS on the interpretation and application of the economic performance requirement.

to the drilling of oil wells?[7] As we will show, Caltex is allowed deductions for 1999 only to the extent that the performance of the drilling-related services was timely under one of several alternative rules.

A. *"All events test"*

Section 461 of the Code and its accompanying regulations provide general rules that govern the timing of deductions. For a taxpayer (like Caltex) that uses the accrual method of accounting, an expense is generally allowed as a deduction for the year the taxpayer incurred the expense, irrespective of the date of payment. Whether a business expense has been "incurred" is determined by the "all events test" as set forth in 26 C.F.R. section 1.461–1(a)(2)(i), Income Tax Regs., which provides:

> Under an accrual method * * * a liability * * * is incurred, and generally is taken into account for Federal income tax purposes, in the taxable year in which all the events have occurred that establish the fact of the liability, the amount of the liability can be determined with reasonable accuracy, *and economic performance has occurred with respect to the liability*. * * * [Emphasis added.]

*See United States v. Gen. Dynamics Corp.*, 481 U.S. 239, 242–243 (1987). The IRS does not dispute that Caltex satisfied the first two requirements of the "all events test" (i.e., (1) that all the events occurred to establish the liability; and (2) that the amount of the liability was determinable with reasonable accuracy). Rather, the IRS contends that Caltex failed to satisfy the third "all events" requirement, namely, "economic performance".

---

[7] Apart from the special allowances of the Code, IDCs would be capital expenditures. Since they benefit future periods, they would have to be capitalized and recovered over those periods for income tax purposes, rather than being expensed for the period the costs are incurred. *See, e.g.*, 26 C.F.R. sec. 1.461–1(a)(2)(i), Income Tax Regs. Notwithstanding this general rule, section 263(c) grants taxpayers the option to currently expense IDCs. *See Keller v. Commissioner*, 725 F.2d 1173, 1178 (8th Cir. 1984), *aff'g* 79 T.C. 7 (1982). However, "this option applies only to expenditures for those drilling and developing items which in themselves do not have a salvage value. For the purpose of this option, labor, fuel, repairs, hauling, supplies, etc., are not considered as having a salvage value, even though used in connection with the installation of physical property which has a salvage value." 26 C.F.R. sec. 1.612–4(a), Income Tax Regs.

B. *Economic performance with respect to services provided to a taxpayer*

1. *General rule: provision of services*

Before the enactment of section 461(h) in the Deficit Reduction Act of 1984 (DEFRA), Pub. L. No. 98–369, sec. 91(a), 98 Stat. at 598, economic performance was not required. With its enactment, section 461(h) expanded the "all events test" by providing that "in determining whether an amount has been incurred with respect to any item during any taxable year, the all events test shall not be treated as met any earlier than when economic performance with respect to such item occurs." Sec. 461(h). Section 461(h) applies to any item allowable as a cost, expense, or deduction, unless specifically exempted by an alternative timing rule in the Code. Sec. 461(h)(2).

Generally, if the liability of the taxpayer arises from a third person's providing services to the taxpayer, economic performance occurs as the services are provided. Sec. 461(h)(2)(A)(i); 26 C.F.R. sec. 1.461–4(d)(2), Income Tax Regs. This general rule is applicable in cases of IDCs under a turn-key contract for the drilling of an oil or gas well. *See* 26 C.F.R. sec. 1.461–4(d)(7), *Example* (*4*).

Before the enactment of section 461(h), when an accrual-basis oil or gas enterprise entered into a contract to receive drilling services, under which the taxpayer was to incur IDCs, it was proper under the "all events test" for the taxpayer to claim a deduction in the year in which the obligation for the IDCs became fixed under the contract, whether or not there was in that year any economic performance of services called for by the contract. As compared to a cash-basis taxpayer, this rule placed an accrual-basis taxpayer in a superior position with regard to IDCs, because the cash-basis taxpayer actually had to prepay its IDCs to be allowed the deduction while an accrual-basis taxpayer only had to become obligated to pay in order to be allowed a deduction. However, since the enactment of section 461(h), the Code has not allowed accrual-basis taxpayers to claim a deduction for IDCs until economic performance of the services under the contract has occurred. Thus, even though the old "all events test" might be met for one tax year because the taxpayer's liability for

payment became fixed and determined in that year, under the rules now applicable to accrual-basis taxpayers, a deduction is allowed for that year only if the economic performance test of section 461(h) is satisfied as well.

As a result, unless an exception to this general rule applies, the IDCs at issue here satisfy the economic performance requirement of section 461(h) for 1999 only to the extent the corresponding services were actually performed in 1999.

### 2. *The two pertinent exceptions in dispute* [8]

Caltex does not contend that Red River performed more than $5 million in services on the last day of 1999 (i.e., the day the contract was executed). [9] Rather, Caltex claims its deduction is warranted under two possible exceptions to the general rule:

### a. *The 90-day rule*

The 90-day rule of section 461(i)(2)(A) allows a taxpayer to deduct IDCs in full prior to economic performance if "drilling of the well commences" within 90 days after the close of the tax year in which the taxpayer prepaid the IDCs and for which the taxpayer is seeking to claim the deduction. The IRS maintains that Caltex is not entitled to the special timing provision of the 90-day rule because no drill penetrated the ground for the purpose of beginning Caltex's wells before the close of the 90th day after the close of 1999 (i.e., by March 30, 2000). In so arguing, the IRS contends that the phrase "drilling of the well commences" as used in section 461(i)(2)(A) requires actual penetration of the ground by a drill bit for purposes of starting the well.

---

[8] A third exception is the recurring item exception of section 461(h)(3)(A)(iii), which allows a taxpayer to claim a deduction in advance of economic performance if certain requirements are met. In its motion the IRS argues that Caltex is not entitled to the recurring item exception because, inter alia, the liability under the contract is not recurring in nature. Caltex does not counter the IRS's argument or explicitly argue that it is entitled to invoke the recurring item exception of section 461(h)(3)(A)(iii). We therefore infer that Caltex concedes this issue and does not invoke the recurring item exception.

[9] Caltex does contend that, even if all its other arguments fail, it is still entitled to a deduction for the cost of any services that Red River actually performed in 1999 under the terms of the contract. The IRS acknowledges that entitlement but argues that Caltex's maximum possible deduction under that theory should be $7,072.80 because Caltex stipulated that "it incurred $7,072.80 of intangible drilling costs relating to Exhibit 5–J (the document entitled 'Turnkey Contract' between Caltex Oil Venture and Red River Exploration, Inc.) during 1999." We address this issue briefly in section V below.

In contrast, Caltex contends that it is entitled to a full deduction for the IDCs for 1999 because it commenced drilling operations, i.e., by securing drilling permits and beginning site preparation, within 90 days of the close of 1999 in satisfaction of section 461(i)(2)(A). Caltex challenges the IRS's interpretation that the 90-day rule requires that a drill bit actually penetrate the ground. Caltex argues that actual drilling is not necessary and that acts normally required to be done before the commencement of actual drilling are sufficient to constitute the commencement of a well or drilling operations.

b. *The 3½-month rule*

In the alternative, Caltex argues that, even if it is not entitled to a full deduction under the 90-day rule, it is entitled, at least, to a partial deduction of IDCs for 1999 under the 3½-month rule of 26 C.F.R. section 1.461–4(d)(6)(ii), Income Tax Regs., which allows a taxpayer to treat a liability as having been economically performed at the time of payment if that taxpayer "reasonably expect[ed] the * * * [provider of services] to provide the services * * * within 3½ months after the date of payment". The IRS maintains that Caltex may not invoke this special timing rule because the 3½-month rule contemplates that, under a non-severable contract, *all* of the services called for must reasonably be expected to be performed within the required time. Caltex disputes the IRS's interpretation of the regulation and contends that it is entitled to a deduction for the *portion of* the contracted services that it reasonably expected to be performed within 3½ months of payment.

We now address these disputed issues.

## III. *The special 90-day rule for oil and gas tax shelters under section 461(i)(2)(A): "if drilling of the well commences"*

Section 461(i)(2)(A) provides a special rule for economic performance as it relates to the drilling of oil and gas wells. This special rule is limited to "tax shelters" as defined in section 461(i)(3). For purposes of this motion, we will assume (favorably to Caltex) that Caltex is such a tax shelter so that it may invoke section 461(i)(2)(A), which provides:

In the case of a tax shelter, economic performance with respect to amounts paid during the taxable year for drilling an oil or gas well shall be treated as having occurred within a taxable year if *drilling of the well commences* before the close of the 90th day after the close of the taxable year. [Emphasis added.]

Thus, accrual-basis oil and gas tax shelters (such as Caltex) may deduct their IDCs in advance of drilling as long as the "drilling of the well commences" within 90 days after the close of the tax year for which the taxpayer is seeking to claim the deduction.

The question that this provision prompts is: When does the "drilling" of a well "commence"?

The IRS maintains that the drilling of a well commences when the well is "spudded", meaning at the beginning of surface drilling (i.e., when the drill bit penetrates the ground), while Caltex argues that drilling is commenced when activities such as site preparation begin.

A. *The plain language of the statute: "drilling * * * commences"*

To construe a statute, we consult first the ordinary meaning of its language, *see Perrin v. United States*, 444 U.S. 37, 42 (1979), and we apply the plain meaning of the words used in a statute unless we find that those words are ambiguous, *United States v. James*, 478 U.S. 597, 606 (1986). Since the 90-day rule was added to the Code in 1984, *see* DEFRA sec. 91(a), and has remained relatively unchanged, these are not antiquated words or terms that would need special interpretation. According to Webster's Third New International Dictionary 690 (2002), to "drill" means "to make (a rounded hole or cavity in a solid) by removing bits with a rotating drill", while to "commence" means "to begin". *Id.* at 456. Giving effect to the plain meaning of these words, we find it unambiguous that "drilling of the well commences" when the boring of a hole for the well begins. Therefore, we find that the plain language of section 461(i)(2)(A) dictates that, as a matter of law, "drilling of the well commences" when the drill bit penetrates the ground to start the hole for the well. Our interpretive task could stop there, with our conclusion based on the plain language of section 461(i)(2)(A).

B. *The title of section 461(i)(2): "spudding"*

However, we need not look far to see strong corroboration of this interpretation—or, if the language were thought ambiguous, resolution of that ambiguity. The title of section 461(i)(2)—"Special rule for *spudding* of oil or gas wells" (emphasis added)—shows the intended meaning of the term "drilling of the well commences". While the title of an act will not limit the plain meaning of the text, *see Strathearn S.S. Co. v. Dillon*, 252 U.S. 348, 354 (1920); *Caminetti v. United States*, 242 U.S. 470, 490 (1917), it may be of aid in resolving an ambiguity, *Fla. Dept. of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008).[10] In the case of section 461(i), the heading is not at any variance with the text. This is an instance in which the heading is "of some use for interpretative purposes",[11] *Wallace v. Commissioner*, 128 T.C. 132, 140–141 (2007), and it confirms our reading of the text of the statute:

To "spud" means "to begin to drill (an oil well) by alternately raising and releasing a spudding bit with the drilling rig". Webster's Third New International Dictionary 2212 (2002).[12] As a result, we find that a well is "spudded" when

---

[10] *See also Graves v. Commissioner*, 89 T.C. 49, 51 (1987); *Keeble v. Commissioner*, 2 T.C. 1249, 1252–1253 (1943). The Court of Appeals for the Third Circuit, to which an appeal of this case would lie, follows this principle: "'[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute.'" *Gay v. CreditInform*, 511 F.3d 369, 385 (3d Cir. 2007) (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998)); *see also United States v. Thayer*, 201 F.3d 214, 221 (3d Cir. 1999) ("the title of a [statutory] section can assist in resolving ambiguities").

[11] The word "spudding" was used not only in the title of the statute but several times in the legislative history. *See* S. Rept. No. 100–445, at 100–101 (1988), 1988 U.S.C.C.A.N. 4515, 4618 ("When the special *spudding* rule for economic performance was adopted by Congress * * * economic performance was deemed to occur at the time of *spudding* of an oil or gas well where the taxpayer had paid for the drilling costs prior to the close of the taxpayer's year. * * * the special *spudding* rule * * * in order for *spudding* to be considered as economic performance" (emphasis added)); H.R. Conf. Rept. No. 98–861, at 884–885 (1984), 1984–3 C.B. (Vol. 2) 1, 138 ("economic performance is deemed to occur with respect to all intangible drilling expenses of a well when the well is '*spudded*.' * * * [If] the *spudding* of the well commenced within 90 days after the close of the taxable year, the entire amount of the prepaid intangible drilling expense would be deductible" (emphasis added)). Thus, if there were any doubt, the legislative history could be cited to confirm the interpretation we have found.

[12] If "spudding", as a specialized term, should be defined by reference to oil and gas sources, then such sources only confirm the dictionary meaning. *See Marathon Oil Co. v. FERC*, 68 F.3d 1376, 1377 (D.C. Cir. 1995) (spudding occurs "where surface drilling had commenced"); American Petroleum Institute, Glossary of Oilfield Production Terminology (1988) (citing API Bulletin D11, "Glossary of Drilling-Fluid and Associated Terms" (2d ed. 1979) (defining "spudding in" as "[t]he starting of the drilling operations of a new hole")) (available at http://www.occeweb.com/og/api-glossary.pdf); Howard R. Williams & Charles J. Meyers, Manual of Oil and Gas Terms 1084 (12th ed. 2003) (defining "spudding in" as "[t]he first boring of the hole in the drilling of an oil well"). In addition, an abridged version of the Dictionary of Petroleum Terms provided

the drill bit penetrates the ground for purposes of drilling an oil or gas well. That being the case, the title that Congress gave to this subparagraph—"Special rule for spudding"— indicates that when Congress said that the special rule would apply "if drilling of the well commences", it meant that the rule would apply if a spudding bit had been raised and released to begin the actual drilling.

## C. *Giving effect to every word in the statute*

In support of its contrary position, Caltex cites several State court opinions that interpret similar language in oil and gas leases but hold that actual drilling is not required. However, in most of the cases Caltex cites, the language and the contexts are different from section 461. [13] Caltex cites one case with language sufficiently close to section 461 to warrant discussion: *Jones v. Moore*, 338 P.2d 872 (Okla. 1959), which interprets a contract term that required a lessee to "commence to drill a well" and holds that the contract was satisfied even without actual drilling. [14] In *Jones* the Supreme Court of Oklahoma held that the "well was commenced" by certain preparatory acts, e.g., staking the location, digging a slush pit preparatory to drilling, and ordering a machine out to drill the well. *Id.* at 874–876. In doing so, the court seems to have ascribed no significance to the presence of the word "drill" in the lease term at issue ("commence *to drill* a well" (emphasis added)), and Caltex would evi-

---

by Petex and the University of Texas Austin (c) Petex 2001 (provided on the Department of Labor's website at http://www.osha.gov/SLTC/etools/oilandgas/glossary__of__terms/glossary__of__terms__a.html) defines "spud" as "1. to begin drilling a well; such as, to spud in. 2. to force a wireline tool or tubing down the hole by using a reciprocating motion", where "spud in" means "to begin drilling; to start the hole." Caltex does not dispute that "spudding" has this specific meaning, nor does Caltex cite any sources that give a different definition of "spudding".

[13] *See Allen v. Cont'l Oil Co.*, 255 So. 2d 842 (La. App. 1971) (interpreting contract term that required "operations for drilling" to have commenced); *Walton v. Zatkoff*, 127 N.W.2d 365 (Mich. 1964) (interpreting contract term requiring commencement of "operations for the drilling of a well" or "the commencement of drilling operations"); *Henderson v. Ferrell*, 38 A. 1018 (Pa. 1898) (interpreting contract term that required lessee "to commence operations on the premises within 30 days"); *Pemco Gas, Inc. v. Bernardi*, 5 Pa. D & C.3d 85 (1977) (interpreting lease term that required "commencement of operations" by a certain date); *Petersen v. Robinson Oil & Gas Co.*, 356 S.W.2d 217 (Tex. Civ. App. 1962) (interpreting contract term requiring the commencement of "operations for drilling"); *Edgar v. Bost*, 14 S.W.2d 364 (Tex. Civ. App. 1929) (interpreting contract term that "well be commenced"); *Fast v. Whitney*, 187 P. 192 (Wyo. 1920) (interpreting contract term that "well be commenced"). None of these sheds any light on the meaning of "if *drilling* of the well *commences*" (emphasis added) in section 461.

[14] Caltex also cites, to the same effect, 2 Walter Lee Summers, Oil and Gas, sec. 349 (1959), *cited in Anderson v. Hess Corp.*, 733 F. Supp. 2d 1100, 1108 (D. N.D. 2010), *aff'd*, 649 F.3d 891 (8th Cir. 2011).

dently have us do the same here. However, we do not face the question whether, under Oklahoma law, lease terms of this nature are understood not to require actual penetration of the ground, despite language literally calling for "drill[ing]". Instead, we interpret a statute (not a lease), and we construe it as a provision of Federal law (not under State law).

In so doing, we follow the "'elementary rule of construction that effect must be given, if possible, to every word, clause and sentence of a statute.'" *Vetco Inc. & Subs. v. Commissioner*, 95 T.C. 579, 592 (1990) (quoting 2A Sutherland Statutory Construction sec. 46.06 (1986)). As a result, we will not ignore or minimize the word "drilling" in section 461(i)(2)(A). To do so would be at odds with the heading of the section (discussed above at III.B.) and its intended purpose (*see supra* note 11). Therefore, we do not find the cases cited by Caltex to be persuasive in aiding our interpretation of section 461.

### D. *Application to Caltex*

Caltex has stipulated that "[n]o drill penetrated the ground for purposes of drilling a well by or on behalf of Caltex Oil Venture during 1999 or 2000." Given that fact, Caltex is not entitled to the special timing rule of section 461(i)(2)(A).

### IV. *The 3½-month rule of 26 C.F.R. section 1.461–4(d)(6)(ii)*

As we have shown, the general "economic performance" rule of section 461(h)(2)(A)(i) provides that economic performance occurs as services are provided to the taxpayer; but section 461(h)(2) conferred on the Secretary the authority to promulgate regulations that would provide alternative timing. Acting under this authority, the Secretary promulgated 26 C.F.R. section 1.461–4(d)(6)(ii), Income Tax Regs., which provides that a taxpayer is allowed to treat services as having been provided (i.e., thereby satisfying the economic performance prong of the "all events test") when the taxpayer makes payment for those services if the taxpayer can "reasonably expect the * * * [provider of services] to provide the services * * * within 3½ months after the date of payment." This is commonly referred to as "the 3½-month rule."

### A. *The parties' contentions*

The IRS maintains that this 3½-month rule does not allow Caltex to treat the services due under the contract as having been economically performed in 1999 because the rule applies only if Caltex could reasonably expect *all* services due under the contract to be provided within 3½ months after the date of payment. The IRS acknowledges a distinction (and a different outcome) where the contract provides for differentiated or severable services to be performed under a single contract. The IRS concedes that, in the case of a divisible contract, also known as a severable contract,[15] economic performance occurs (and any applicable economic performance exception will apply) separately with regard to each distinct service that was contracted for as that service is provided. *See* 26 C.F.R. sec. 1.461–4(d)(6)(iv), Income Tax Regs. ("If different services * * * are required to be provided to a taxpayer under a single contract or agreement, economic performance generally occurs over the time each service is provided"). However, the IRS maintains that the same is not so if a contract—like, it points out, the turnkey contract[16] at issue here—does not specifically provide for differentiated services.

Caltex disagrees and argues that the IRS's interpretation of the 3½-month rule must be rejected because if *all* the services called for under a turnkey contract had to be performed within 3½ months of payment, the rule could never be applicable to the oil and gas industry. Our record shows that digging an oil well usually takes over two years from conception to production and necessarily requires, among other things, extensive data collection, lease acquisitions, securing access roads, staking and permitting of the well site, negotiating contracts for subcontract services, buying and building

---

[15] Where several things are to be done under a contract, and the money consideration to be paid is apportioned to each of the items, the contract is ordinarily regarded as severable. *MacArthur v. Commissioner*, 168 F.2d 413 (8th Cir. 1948), *aff'g* 8 T.C. 279 (1947); *Canister Co. v. Wood & Selick, Inc.*, 73 F.2d 312, 314 (3d Cir. 1934). On the other hand, if the consideration to be paid is single and entire, the contract will ordinarily be held as entire, *see United States v. U.S. Fid. & Guar. Co.*, 236 U.S. 512, 524–525 (1915); *Traiman v. Rappaport*, 41 F.2d 336, 338 (3d Cir. 1930), "although the subject thereof may consist of several distinct and wholly independent items," *Fullmer v. Poust*, 26 A. 543, 543 (Pa. 1893).

[16] "A turnkey contract has a definite meaning in the oil industry. It is a contract where the driller undertakes to furnish everything, and to do all the work required to complete the well, place it on production, and turn it over ready to 'turn the key' and start the oil running into the tanks." *Cont'l Oil Co. v. Jones*, 177 F.2d 508, 510 (10th Cir. 1949).

surface facilities, and the actual drilling and production of oil or gas. Instead, Caltex maintains that the rule permits a taxpayer to accelerate a deduction for just the allocable cost of the services that would be provided in the 3½-month period from payment. In taking this position, Caltex does not address the IRS's distinction between a severable and non-severable contract.

Thus, the questions before us are (i) whether the 3½-month rule contemplates that *all* of the services called for under a contract must be provided within 3½ months of payment, or whether the rule permits a taxpayer to accelerate a deduction for just the portion of the services that would be expected to be provided in the 3½-month period from payment, and (ii) whether the interpretation and application of the 3½-month rule changes depending on whether the contract at issue is severable or non-severable.

B. *Construing 26 C.F.R. section 1.461–4(d)(6)(ii)*

1. *The ambiguity of the regulation*

The starting point for interpreting a regulatory provision is, as with a statute, its plain meaning. *Walker Stone Co. v. Sec'y of Labor*, 156 F.3d 1076, 1080 (10th Cir. 1998) ("When the meaning of a regulatory provision is clear on its face, the regulation must be enforced in accordance with its plain meaning"); *Intermountain Ins. Serv. of Vail, L.L.C. v. Commissioner*, 134 T.C. 211, 218 (2010), *rev'd on other grounds*, 650 F.3d 691 (D.C. Cir. 2011). The 3½-month rule inquires whether Caltex reasonably expected Red River "to provide *the services*" within the relevant time period. *See* 26 C.F.R. sec. 1.461–4(d)(6)(ii), Income Tax Regs. (emphasis added). The IRS argues that this rule contemplates that "the services" called for under a contract—i.e., *all* of the contracted services—must be provided within 3½ months of payment, while Caltex maintains that the rule permits a taxpayer to claim a deduction for just the *portion of* the services that would be expected to be provided in the 3½-month period from payment. The IRS thus contends in effect that "the services" means "*all of* the services", and Caltex contends in effect that it means "*any of* the services".

We think that the IRS's proffered meaning (i.e., all of the services) is the more likely. The regulation reads:

A taxpayer is permitted to treat services or property as provided to the taxpayer as the taxpayer makes payment to the person providing the services or property (as defined in paragraph (g)(1)(ii) of this section), if the taxpayer can reasonably expect the person to provide the services or property within 3½ months after the date of payment. [26 C.F.R. sec. 1.461–4(d)(6)(ii), Income Tax Regs.]

The regulation thus presumes a correlation between "the services" and "payment" therefor. Where multiple services are provided pursuant to a contract that calls for a single payment, and the single payment is thus not linked to fewer than all of the contracted services but is instead paid for all of the contracted services, "the services" that must be provided within 3½ months would seem to be the services for which "payment" is made—i.e., all the services.

However, the regulation does not include either the phrase "all of" or the phrase "any of". We cannot say that Caltex's interpretation is impossible. Since the meaning of the regulation is thus ambiguous, we will look to other principles and canons [17] to see whether they confirm or correct our initial reading of the regulation.

### 2. *Narrow construction of deductions*

It is well settled that deductions are a matter of legislative grace and should be narrowly construed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934). Caltex asks us to read the 3½-month rule expansively—i.e., giving the taxpayer a greater entitlement to accelerate deductions—whereas the IRS's interpretation is narrower. This tends in favor of the IRS's interpretation, especially since the 3½-month rule, even narrowly construed, is already a relaxation of the general economic performance rule of section 461(h) and expands taxpayers' entitlement to a deduction. [18]

---

[17] The IRS's interpretation of 26 C.F.R. sec. 1.461–4(d)(6)(ii) has not been announced in any published guidance. Because we uphold this interpretation on other grounds, we need not reach the question whether, as the IRS contends, this is a circumstance in which we should defer to the agency's unpublished interpretation of its own regulation.

[18] The Secretary showed an intention to limit the relaxation of the economic performance rule. Some commentators on the Secretary's initial proposed regulations encouraged the IRS to adopt final regulations with a "payment trump" rule—i.e., treating the time of payment as full economic performance, *see* T.D. 8408, 1992–1 C.B. 155, 157—and others suggested that the proposed 3½-month rule be extended to six months, *see id.*, 1992–1 C.B. at 157. Rejecting these suggestions in the final regulations, the Secretary determined that "the policy of section 461(h) would be frustrated" by adopting the "payment trump" rule and that "the 3½-month rule appro-
Continued

### 3. *The history of the 3½-month rule*

It is well settled that where a statute is ambiguous, we may look to legislative history to ascertain its meaning. *Burlington N. R.R. v. Okla. Tax Comm'n*, 481 U.S. 454, 461 (1987); *Griswold v. United States*, 59 F.3d 1571, 1575–1576 (11th Cir. 1995). The rules of statutory construction also apply to the construction of regulations. *See Estate of Schwartz v. Commissioner*, 83 T.C. 943, 952–953 (1984). Therefore, when a regulation is ambiguous, we may likewise consult its "regulatory history"—i.e., statements made by the agency contemporaneously with proposing and adopting the regulation—to ascertain its meaning. *See Armco, Inc. v. Commissioner*, 87 T.C. 865, 868 (1986) ("A preamble will frequently express the intended effect of some part of a regulation * * * [and] might be helpful in interpreting an ambiguity in a regulation"); *see also Abbott Labs. v. United States*, 84 Fed. Cl. 96, 103 (2008) ("the court [is] permitted to consult the agency's interpretations or the regulatory history to determine meaning" if the regulation is ambiguous), *aff'd*, 573 F.3d 1327 (Fed. Cir. 2009). Proposed regulations under section 461(h) were issued on June 7, 1990, and adopted on April 9, 1992. *See* Notice of Proposed Rulemaking, Economic Performance Requirement, IA–258–84, 1990–2 C.B. 805; T.D. 9408, 1992–1 C.B. 155. In publishing the proposed regulations, the Secretary explained the origin of the 3½-month rule:

[I]n the case of a liability of a taxpayer arising from the provision by another person of property or services to the taxpayer, the statute provides that economic performance occurs as the property or services are provided to the taxpayer. The regulations provide rules designed to *lessen the burden on a taxpayer incident to determining when property or services are provided to the taxpayer*. For example, the regulations provide that a taxpayer may treat property or services as provided to the taxpayer as the taxpayer makes payment for the property or services. However, this treatment is available only if the taxpayer can reasonably expect the property or services to be provided by the other person within 3½ months after the payment is made. [1990–2 C.B. 805, 806; emphasis added.]

--------

priately operates to relieve taxpayers of the burdens incident to determining precisely when services and property are provided, while assuring that economic performance occurs within a reasonable time following payment." *Id.*

In promulgating the final regulations (in which he rejected a suggestion to lengthen the 3½-month period; *see supra* note 18), the Secretary repeated—

that the 3½-month rule appropriately operates to *relieve taxpayers of the burdens incident to determining precisely when services and property are provided*, while assuring that economic performance occurs within a reasonable time following payment. [T.D. 8408, 1992–1 C.B. at 157; emphasis added.]

Therefore, the history of 26 C.F.R. section 1.461–4(d)(6)(ii) is emphatic about avoiding the burden of having to determine precisely when services were provided. It would be somewhat at odds with such a regime—engineered to avoid difficulties in determining when services have been provided—to allow a taxpayer to accelerate deductions for just the portion of services expected to be provided within 3½ months of payment and, in order to do so, to make ex post facto valuations of those services—valuations that would require fact-intensive analyses by both the taxpayer and the IRS. This is the very difficulty that the regulation sought to avoid. We hardly think that the Secretary intended this result when promulgating the 3½-month rule.

### 4. *Difficulty for the oil and gas industry*

Caltex argues that the IRS's interpretation of the 3½-month rule must be rejected because if *all* the services called for under a turnkey contract have to be performed within 3½ months of payment, the 3½-month rule could never be applicable to the oil and gas industry because of the immensity of its projects, thereby making the rule superfluous.

It is true that, generally speaking, an interpretation that renders a statutory provision superfluous should be avoided, since that interpretation would offend "the well-settled rule of statutory construction that all parts of a statute, if at all possible, are to be given effect." *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 633 (1973).

However, the 3½-month rule is a *general* exception to the economic performance rule of section 461(h). It is not an exception that is specific to the oil and gas industry. *Cf.* sec. 461(i)(2)(A). As a result, even if it were true that the 3½-month rule could not be used in the oil and gas industry, that fact would not be sufficient by itself to invalidate the

IRS's proposed interpretation, because inapplicability to one particular industry does not make a provision entirely super-fluous.

Moreover, we do not find that the IRS's interpretation of the 3½-month rule would *always* make it inapplicable to the oil and gas industry. For example, if a contract for the drilling of an oil or gas well were drafted in such a manner that payments were allocated to specified services, the 3½-month rule could apply to such oil and gas contracts. *See* 26 C.F.R. sec. 1.461–4(d)(6)(iv), Income Tax Regs. Or, if some or all of the preparatory activities were already completed at the time the taxpayer entered into a turnkey contract and made payment and the remaining services that were the sub-ject of the contract could be completed in 3½ months, then under such a contract *all* the services under the contract could be completed within that 3½-month period.

In any event, we do not reject the IRS's interpretation of the 3½-month rule simply because the rule might be used in the oil and gas industry only infrequently.

C. *Application to Caltex*

1. *Caltex is not entitled to the special timing provisions of the 3½-month rule.*

We hold that the 3½-month rule contemplates that *all* of the services called for under an undifferentiated, non-sever-able contract must be provided within 3½ months of pay-ment. Therefore, a determination of Caltex's entitlement to use the 3½-month rule requires (1) a determination of whether the contract at issue is an undifferentiated, non-severable contract (*see supra* note 15), versus a severable one, and (2) a determination of whether the services called for thereunder could have reasonably been expected to be performed within 3½ months of payment. In doing so, we find that Caltex is not entitled to the special timing provi-sions of the 3½-month rule.

Caltex's contract with Red River fits the definition of a "turnkey contract" (*see supra* note 16). It did not provide an exhaustive, itemized list of services to be provided to Caltex by Red River (or its subcontractors) with particular payments associated with or allocated to each service. Instead, the con-tract enumerated some, but not all, of the services to be pro-

vided in order for Red River to "commence or cause to be commenced" the drilling of wells at the two sites, and it called for lump-sum payments of $4,123,333 for drilling costs and $1,049,333 for completion costs without any allocation of those sums to particular services. As a result, we hold that the contract at issue here is an entire, non-severable contract, as the IRS contends.

Given that the contract is non-severable, Caltex may use the 3½-month rule only if *all* the services called for in the contract with Red River could have been reasonably expected to be performed within 3½ months of payment. Caltex has never alleged that it expected all of the services to be provided within 3½ months of payment. On the contrary, Caltex concedes that it did *not* reasonably expect all services to be performed within 3½ months of payment, since "turnkey contract services in the oil and gas industry could never be completed in such a limited time frame." As a result, we find that Caltex may not treat any of the services due under the contract as having been economically performed in 1999 by operation of the 3½-month rule of 26 C.F.R. section 1.461–4(d)(6)(ii).

### 2. *Deductions under the 3¹/₂-month rule are limited to payments made by cash or cash equivalents, not notes.*

For purposes of the regulation at issue, "payment" has the same meaning as it has for taxpayers using the cash receipts and disbursement method of accounting. *See* 26 C.F.R. sec. 1.461–4(d)(6)(ii), Income Tax Regs. (defining "payment" by reference to 26 C.F.R. section 1.461–4(g)(1)(ii)). Pursuant to 26 C.F.R. section 1.461–4(g)(1)(ii)(A),

payment includes the furnishing of cash or cash equivalents and the netting of offsetting accounts. Payment does not include the furnishing of a note or other evidence of indebtedness of the taxpayer, whether or not the evidence is guaranteed by any other instrument (including a standby letter of credit) or by any third party (including a government agency).

After this regulation was proposed, *see* Notice of Proposed Rulemaking, Economic Performance Requirement, IA–258–84, 1990–2 C.B. 805, 814, commentators objected to this rule and, among other things, asked that the regulation provide that a note or other evidence of indebtedness which bears an arm's-length rate of interest be included as "payment". T.D.

8408, 1992–1 C.B. at 159. The Secretary rejected this suggestion because he "believe[d] that consistent use of the cash method definition of payment provides an administrable rule that is consistent with congressional intent." *Id.* Therefore, for purposes of the 3½-month rule, the "payments" made by Caltex would not include any notes executed in favor of Red River, but instead would include only the two payments made by Caltex to Red River via checks in the amounts of $308,293.50 and $119,892. As a result, even if Caltex were able to invoke the 3½-month rule, it would be able to deduct only the amount of its actual payments (i.e., $428,185.50), not the approximately $5.2 million it attempted to deduct.

## V. *Economic performance under the general rule of section 461(h)*

Even though Caltex does not qualify for the exceptions discussed above, it may still invoke the general rule of section 461(h). That statute provides that "the all events test shall not be treated as met any earlier than when economic performance with respect to such item occurs"; and, if the liability of the taxpayer arises from a third person providing services to the taxpayer, "economic performance occurs as such person provides such services". Sec. 461(h)(1), (2)(A)(i). Thus, Caltex remains entitled to deduct for 1999 the payments it made in 1999 for services actually performed in 1999.

The IRS acknowledges this principle but argues that economic performance with respect to at least $5,165,593.20 of the claimed IDCs of $5,172,666 did not occur in 1999, because (it says) Caltex stipulated that only $7,072.80 of the IDCs due under the contract was incurred in 1999. The actual language of the stipulation is: "Petitioner contends that it incurred $7,072.80 of intangible drilling costs relating to * * * [the contract] during 1999." Therefore, reasons the IRS, Caltex's maximum potential deduction for IDCs for 1999 under section 461(h) is $7,072.80.

Caltex counters that while it stipulated that it contends that $7,072.80 of IDCs was incurred in 1999, it did not stipulate that it contends that *only* $7,072.80 of IDCs was incurred in 1999. As a result, Caltex maintains that the precise amount of IDCs incurred in 1999 remains in dispute.

We think the IRS's reading of the stipulation is the more likely reading. However, we cannot say that Caltex's reading is impossible, and we currently address this question not after a trial but under Rule 121. In deciding the IRS's motion for partial summary judgment, we must draw every inference in favor of the non-moving party, Caltex. As a result, there remains a genuine issue of material fact regarding the amount, if any, of IDCs incurred by Caltex in 1999 (and the effect, if any, of the parties' stipulation on Caltex's ability to claim deductions in excess of $7,072.80).

Moreover, we note that the IRS does *not* maintain that, by way of summary judgment on this point, we can use the stipulation to avoid a trial on the issue of the amount of Caltex's 1999 IDC deductions under the general rule of section 461(h). The IRS does *not* concede that Caltex may actually deduct $7,072.80 in IDCs for 1999. Instead, the IRS argues that factual issues relating to the deductibility even of the $7,072.80 should remain for trial and that such issues include (i) whether the services to which the $7,072.80 relate were performed in 1999, and (ii) if so, whether the services were performed *before* Caltex acquired interests in the wells. *See Haass v. Commissioner*, 55 T.C. 43, 50 (1970) (holders of interests in oil and gas wells may deduct IDCs only after they have been granted operating rights to the wells to which those costs relate). It is not worthwhile for us to attempt resolve under "genuine issue of material fact" standards a controversy about the interpretation of a stipulation, only to then have to address in large part the issue that summary judgment should resolve. These considerations also tilt this question in Caltex's favor, for purposes of the IRS's motion.

## *Conclusion*

The IRS is entitled to summary judgment on two issues: (1) Caltex is not entitled to the 90-day special timing rule of section 461(i)(2)(A); and (2) Caltex is not eligible to treat any services due under the contract as having been economically performed in 1999 under the 3½-month rule of 26 C.F.R. section 1.461–4(d)(6)(ii), Income Tax Regs. Whether, and to what extent, Caltex may be entitled to deduct some of its IDCs for 1999 on the basis of the general economic performance rule of section 461(h) is still in dispute.

To reflect the foregoing,

*An appropriate order will be issued.*